DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 INTRODUCTION {¶ 1} Arnold LeBeau is a former employee of Seaman Corporation. He was injured at work when his right hand was pulled into the "nip point" between a pair of rollers on a machine he was operating. He sued Seaman, arguing that it had intentionally injured him. The trial court granted Seaman summary judgment, and Mr. LeBeau has appealed. He has argued to this Court that there are genuine issues of material fact and Seaman is not entitled to judgment as a matter of law on his intentional tort claim. This Court affirms the trial court's judgment because Mr. LeBeau failed to present evidence that, if believed, would establish that *Page 2 
Seaman knew employees were substantially certain to be injured by the rollers of the machine he was operating when he was hurt.
 THE LEMBO DOUBLE DRUM LAMINATOR EMBOSSER {¶ 2} Seaman produces material that is used to manufacture tents and tarps. At the time he was hurt, Mr. LeBeau was operating a Lembo double drum laminator embosser, which is known at Seaman as "Line-Eight." Line-Eight laminates a film to fabric and trims the resulting product. That product is further processed by Seaman before being sold to tent and tarp manufacturers.
 {¶ 3} The record does not include a complete description of Line-Eight, but some things about it are clear. The fabric to be processed by Line-Eight comes on large rolls. A roll is wheeled to the "back" of the line on a cart, and the fabric is threaded through the line from an initial pair of rollers at the back to a rewind mechanism at the "front."
 {¶ 4} During normal operation of the line, the initial rollers are not powered. Rather, they turn freely and serve only to guide the fabric into the line. They are capable of operating under power, however, and, when they do, they pull fabric from the roll.
 {¶ 5} The record does not include evidence of the location of the main controls for Line-Eight. The initial rollers, however, are operated by four buttons located beside those rollers. The buttons are arranged one above the other. From top to bottom, they are: (1) an emergency stop button; (2) a start button; (3) a stop *Page 3 
button; and (4) a jog button. If the operator pushes the start button, the initial rollers are powered until he pushes either the stop button or the emergency stop button. While it is obvious that pushing either the stop button or the emergency stop button interrupts power to the rollers, there is nothing in the record that indicates whether one or the other does something in addition to interrupting power to those rollers. The jog button is spring loaded, and pushing it powers the rollers only so long as it is held down. There is also a lever that lowers the bottom roller to open the nip point between the rollers, although there is no evidence in the record about how wide the opening becomes.
 {¶ 6} When changing from one roll to another of the same fabric, the operator "sews" the lead end of the fabric on the new roll to the tail end of the fabric from the old roll. It is not clear how the fabric is "sewn," but it is apparently an automated process that can be completed in less than five minutes. Once the new fabric is sewn to the old, the new fabric is pulled into the line. The sewing process eliminates the need to rethread the line each time a new roll is started.
 {¶ 7} When the initial rollers are powered, they operate at a higher speed than the rewind mechanism at the front of the line. Just beyond the initial rollers, there is a well, known as a "J-Box," in which a "batch" of fabric can be accumulated. Shortly before the tail end of a roll of fabric being fed into the line is reached, the operator begins "batching." He uses the jog button to power the *Page 4 
initial rollers, thereby pulling fabric from the roll faster than it is being pulled further down the line. Two assistants, one on each side of the J-Box, guide the excess fabric into the J-Box. Once the J-Box is full, the operator stops pushing the jog button, thereby interrupting the power to the initial rollers. The batching process results in the rewind mechanism at the front of the line pulling fabric from the J-Box rather than directly from the roll. The J-Box holds enough fabric to feed the line for five minutes. This allows the line to continue to operate, using the batched fabric, while the operator sews the lead end of the fabric from the new roll to the tail end of the fabric from the old roll. The goal is to complete the sewing before the batched fabric is exhausted so that, when it is exhausted, the rewind mechanism will begin pulling fabric from the new roll without interruption.
 HOW MR. LEBEAU WAS HURT {¶ 8} On the day Mr. LeBeau was hurt, he and two assistants were running fabric for army tents through Line-Eight. They were getting near the tail end of the roll from which the line was pulling fabric, so they began the batching process. Mr. LeBeau testified that he had been trained to use the jog button while batching, and was doing so that day. As they were batching, the fabric got "caught up, wound up in the rollers as it [was] going into the J-Box . . . wound up around." Mr. LeBeau stopped pressing the jog button, and he and one of the assistants pulled the excess fabric out from around the rollers. Mr. LeBeau testified that, to restart the batching process, he again pressed the jog button, but, as he did, the tail *Page 5 
end came off the roll. According to him, he took his hand away from the jog button and grabbed the fabric to prevent inertia from pulling the tail end through the initial rollers. He testified that he had seen other operators grab the fabric in a similar fashion and had previously done so himself. Rather than turning freely, however, the initial rollers were, for some reason, still powered, and, instead of stopping when he grabbed the fabric, they continued to turn and the fabric pulled his right hand into the nip point between them. He tried to pull his hand from between the rollers, but was unable to do so. He braced himself with his left hand to keep his right hand from being pulled further between the rollers.
 {¶ 9} Mr. LeBeau shouted and attracted the attention of one of the assistants working with him. She pushed an emergency-stop button beside where she was standing, which she thought would interrupt power to the initial rollers. That button, however, controlled the rest of the line, and pushing it did not interrupt power to the initial rollers. She then pushed the lever to open the nip point. It is not clear whether the nip point did not open, or whether it did and the opening was not wide enough to release Mr. LeBeau's hand. Either way, the rollers continued to pull his hand. Finally, an assistant working on the line next to Line-Eight ran over and pushed the stop button for the initial rollers, allowing Mr. LeBeau to extract his hand. Mr. LeBeau suffered a crush avulsion injury as a result of his hand being pulled between the rollers.
 THIS COURT'S STANDARD OF REVIEW *Page 6 {¶ 10} Mr. LeBeau's sole assignment of error is that the trial court incorrectly granted Seaman summary judgment. In reviewing an order granting summary judgment, this Court applies the same test a trial court is required to apply in the first instance: whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. Parenti v. Goodyear Tire RubberCo., 66 Ohio App. 3d 826, 829 (1990).
 THE UNAUTHENTICATED DOCUMENTS THAT WERE BEFORE THE TRIAL COURT {¶ 11} Seaman supported its motion for summary judgment with the transcripts of several depositions. It also relied upon a number of documents that were not incorporated into a properly framed affidavit or otherwise authenticated. See DaimlerChrysler Services North America v.Lennington, 9th Dist. No. 05CA0055, 2006-Ohio-1546, at ¶ 15. Mr. LeBeau, however, did not move the trial court to strike the documents; rather, in the text of his memorandum in opposition to summary judgment, he suggested that the trial court should not consider the unauthenticated documents.
 {¶ 12} A trial court magistrate recommended that Seaman be granted summary judgment. Mr. LeBeau objected to the magistrate's recommendation for a number of reasons, including that Seaman had supported its motion with unauthenticated documents. At the same time Seaman responded to his objections, it filed an affidavit purporting to authenticate the documents. *Page 7 
 {¶ 13} Mr. LeBeau has not assigned an error related to the unauthenticated documents. Rather, in an ambiguous footnote, he has suggested that the trial judge does not appear to have considered the affidavit Seaman submitted and argued that this Court "should not either because doing so would result in serious and undue prejudice to Plaintiff." It is unclear whether the footnote is also intended as an assertion that this Court should not consider the unauthenticated documents in determining whether Seaman is entitled to summary judgment.
 {¶ 14} Despite Mr. LeBeau's failure to move the trial court to strike the documents, his failure to assign error related to those documents, and his failure to unambiguously argue that this Court should not consider them, this Court will not consider them. Even in the absence of those documents, there are no genuine issues of material fact and Seaman is entitled to judgment as a matter of law.
 THE TRIAL COURT CORRECTLY GRANTED SEAMAN SUMMARY JUDGMENT {¶ 15} In Blankenship v. Cincinnati Milacron Chemicals Inc.,69 Ohio St. 2d 608 (1982), the Ohio Supreme Court held that Ohio's Workers' Compensation Act, Chapter 4123 of the Ohio Revised Code, does not protect an employer from liability for injuries to its employees caused by the employer's intentional torts. The Supreme Court held that, while Ohio's workers' compensation system is "based on the premise that an employer is protected from a suit for negligence in exchange for compliance with the . . . Act[,]" an employer's intentional conduct is not covered by the Act. Id. at 614. *Page 8 
 {¶ 16} In order to prevail on an intentional tort claim against an employer, an employee must establish three essential elements: (1) that the employer knew of the danger that caused harm to the employee; (2) that the employer knew that employees were substantially certain to be harmed if exposed to that danger; and (3) that the employer required the employee to continue to perform the dangerous task. Fyffe v. Jeno'sInc., 59 Ohio St. 3d 115, paragraph one of the syllabus (1991). If an employer carries its initial summary judgment burden regarding any one of those essential elements and the employee fails to establish a genuine issue of fact regarding that element, the employer is entitled to summary judgment on the employee's claim. See Flint v. InternationalMultifoods, 9th Dist. No. 06CA008918, 2007-Ohio-679, at ¶ 13.
 {¶ 17} In support of its motion for summary judgment, Seaman argued that Mr. LeBeau would not be able to prove any of the essential elements of his claim. In regard to the second essential element, that the employer knew that employees were substantially certain to be harmed, it pointed to evidence that there had not been any prior injuries similar to Mr. LeBeau's or any complaints regarding the safety of Line-Eight. Richard Buchholz, who was Seaman's production manager at the time of Mr. LeBeau's injury, testified that he was not aware of anybody other than Mr. LeBeau ever being hurt while working on Line-Eight. In fact, he did not know of anyone suffering anything more serious than a cut or bruise on any of the lines at Seaman before Mr. LeBeau's injury. Mr. LeBeau testified at his *Page 9 
deposition that he had never complained about the safety of the "batching station" and was not aware of anyone else doing so.
 {¶ 18} In order to attempt to establish a genuine issue of fact regarding whether Seaman knew that employees were substantially certain to be harmed by the initial rollers on Line-Eight, Mr. LeBeau submitted an affidavit prepared by Richard Harkness, a professional engineer. Mr. Harkness stated that the nip point of the rollers that caused Mr. LeBeau's injury was unguarded and that "[t]he dangers to personnel of an unguarded inrunning nip point have been recognized for many years" He further stated that "[t]he failure of Seaman to properly safeguard the inrunning nip point meant that an injury to someone at some time was inevitable" and that "Seaman knew that other employees as well as the operator were at risk of injury from the unguarded inrunning nip point." He concluded:
 Seaman knew that if their employees were subjected by their employment to this dangerous process, procedure, instrumentality or condition, then harm to their employees would be a substantial certainty.
 {¶ 19} As mentioned above, Mr. Harkness asserted that the nip point of the rollers that caused Mr. LeBeau's injury was unguarded. Seaman has disputed that assertion, pointing to photographs of the rollers that show a yellow bar running the length of the rollers in front of the nip point. According to Mr. Harkness, that bar was a guide for the fabric and not a guard. The fabric pulled Mr. LeBeau's hand *Page 10 
under the bar and into the nip point. At his deposition, Mr. LeBeau acknowledged that it did not seem as though his hand would fit under the bar:
 Q. In other words, it was caught underneath the bar?
 A. Yes. It don't seem like it would get in there, but it got in there.
 Q. Had you ever seen anybody else's hand get in between the bottom portion of the bar and the roll?
 A. No.
 Q. And it didn't seem to you like your hand could get in there?
 A. It didn't seem like it.
According to Seaman, the bar would prevent most accidental contact with the nip point, but it would be impossible for a guard to prevent the type of incident that caused Mr. LeBeau's injury because there must be space under the guard for fabric to be pulled into the rollers. Mr. Harkness failed to suggest a type of guard that would have prevented Mr. LeBeau's injury. More importantly, Mr. LeBeau failed to point to any evidence that Seaman knew that an injury like that suffered by Mr. LeBeau was substantially certain to occur despite the presence of the yellow bar.
 {¶ 20} Mr. LeBeau testified that he had pushed the jog button immediately before his injury and that, for some reason, power to the rollers was not interrupted when he stopped doing so. If that is true, the jog button malfunctioned and the malfunction allowed the circumstance that caused his injury. Mr. LeBeau failed to introduce any evidence that the jog button had previously malfunctioned or, if it had, that Seaman was aware of that fact. *Page 11 
 {¶ 21} In his affidavit, Mr. Harkness suggested that it was more likely that, instead of pushing the jog button, Mr. LeBeau had mistakenly pushed the start button so that, when he removed his finger from the button, power to the rollers was not interrupted. Again, Mr. LeBeau presented no evidence of any operator previously making that mistake or, if one had, that Seaman was aware of it.
 {¶ 22} Knowledge that injury is substantially certain to occur requires recognition of a very high probability of harm, not merely risk of harm:
 [P]roof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent.
Fyffe v. Jeno's Inc., 59 Ohio St. 3d 115, at paragraph two of the syllabus (1991). In order for Seaman to have known that an employee was substantially certain to be harmed in the manner that Mr. LeBeau was, it would have had to have recognized that the jog button might malfunction or that the employee might mistakenly push the start button instead of the jog button, that he would grab the fabric without recognizing that power had not been interrupted to the rollers, and that his hand would fit under the bar in front of the nip point. He failed to present any evidence of any such recognition by Seaman. *Page 12 
 {¶ 23} Subsequent to Mr. LeBeau's injury, Seaman had a safety trip wire installed in front of the initial rollers on Line-Eight. Contact with the trip wire interrupts power to those rollers. Installation of the trip wire is not evidence that, prior to Mr. LeBeau's injury, Seaman recognized that employees were substantially certain to be harmed by those rollers. It only shows that it took remedial action to insure that others are not injured in the same way Mr. LeBeau was. There is no genuine issue of material fact regarding the second essential element of Mr. LeBeau's claim against Seaman, and Seaman is entitled to judgment as a matter of law.
 CONCLUSION {¶ 24} Mr. LeBeau's assignment of error is overruled. The trial court's judgment is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27. *Page 13 
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to appellant.
 WHITMORE, P. J. MOORE, J. CONCUR *Page 1